Case today, 2013-1450 Hill-Rom v. Stryker. Mr. Callahan, when you're ready, you may proceed. Thank you, Your Honor. May it please the Court. The invention in this case is relatively straightforward. We lay it out both schematically and by reference to Claim 1 of the OCA patent, pages 7 and 8 of our opening brief. It involves a hospital bed that has signal generators on it that will generate signals in response to something that's going on or not going on with the bed. Those create an input signal that go to an interface board that has a processor. That processor creates bed condition messages relative to what's going on or not going on on the bed. And they send those via a data link to a remote processing station. This allows a nurse or other person in the hospital to monitor the condition of multiple beds from a single location. And it allows them to check on various unsafe conditions that might arise in their absence. We know how the invention works. Don't you want to get to your claim terms? I do, Your Honor. Data link, we'll start with data link because in this case, both the District Court and Stryker urges here that almost every step of that where a relatively broad term is used, the District Court adopted a very narrow construction taken in most instances right out of the preferred embodiment of the specification. How broad was that term back 20 years ago when the patent was... Data link, Your Honor? Yes. Well, data link, I think, is just a way of getting data from one location to another. And the District Court looked at three reasons. Stryker adds a fourth on appeal, but the District Court looked at three reasons why that ought to be limited to the preferred embodiment disclosed in the specification. The first is that it's the preferred embodiment located in the specification. This court repeatedly cautioned that we shouldn't read limitations from the preferred embodiment into the claims. The second is just the inverse of the first. It collapses into the first. The second is the District Court says the patent does not have an embodiment that discloses wireless data links. And the third that the District Court relied on is a comment made by an examiner in another case... Does a specification ever recite a wireless connection? It does not disclose... the specification does not disclose an embodiment that has a wireless connection. But, Your Honor, I think this wouldn't be any... Or a description. Does it describe data link so as to encompass a wireless connection? It describes data link merely as a mechanism for getting the bed condition messages from the interface board to the remote processing station. That's all it does. This would be not unlike a situation, Your Honor, where you had an inventor, analogous to the inventor in this case, who invented the television. The television that they described had a single embodiment, black and white only. Someone comes along later and invents a color television. And in connection with that, maybe it's even the same inventor. The patent office cites the black and white patent and the inventor on the color TV patent says, My invention here, color, is different. It's something new. We wouldn't then read a limitation from the original claim, say, picture, to be limited only to black and white. Even though the original specification discloses black and white and black and white only. Does not disclose color. And later on, the patentee or maybe an examiner examining it took note of the fact that the original application discloses only black and white and not color. We would never go back under this court's jurisprudence. We wouldn't go back and import the limitation of the black and white television, the black and white picture only, to some term, say, picture, or visual representation. We wouldn't limit it only to black and white, simply because that's all that's described in the specification. But at some point, we have to draw a line. That's right, Your Honor. And we can't, in my view, give the patentee what the patentee has not claimed. We cannot broaden the scope of a patent to a point to where it encompasses inventions and other products, especially a rising after type technology that did not exist when the patent was granted or that the patentee clearly did not encompass. Well, I think, Your Honor, this court's jurisprudence does allow a patent. Again, I would go back to the example of the black and white television. One could infringe. We would certainly allow claims to be written so that the color television infringes the black and white patent. We wouldn't say, because you've created something new and different, you've created a different new way to display the picture using color, that we're going to limit your invention or limit your claims to only the embodiments that you disclosed in your patent. This court has said both, that we should not import limitations from the specification into the claims of a patent. And it has said that that is true even where there's only a single embodiment. Well, the specification uses data link interchangeably with cable and serial cable. Makes it seem like it's treating them as synonyms for each other. So what is your evidence that the plain meaning of data link to one of Skill and the Art at the time would have included wireless transmission? Well, the plain meaning of data link, Your Honor, includes transmitting data from one place to another. That's what happens in the patent. What happens in the patent is it's transferred across a cable. Did you introduce, for example, expert testimony or treatises or dictionaries? What is the evidence about the plain meaning? There was evidence below that the district court considered but rejected that data link would have the broader meaning of moving data from one place to another. What was the evidence? From an expert witness, Your Honor. Can you tell me what page it is?  Evidence that was considered by the district court but rejected. As to the point... Did Stryker acknowledge at some point that the plain meaning of the term data link would be broader than just a cable? I think Stryker has always taken the position in this case, Your Honor, that the, quote, plain and ordinary meaning of data link is what comes out of the preferred embodiment. A cabled connection and only a cabled connection. Now, the other problem with that, Your Honor, I think, is that in the 03A patent, Claims 3, which depends from Claim 1, and Claim 10, which depends from Claim 8, the two independent claims, both add the limitation over a cable, over utilizing a cable. It's a data link in which the data is moved using a cable. This is where claim differentiation, Your Honor, this court has said, is at its very strongest. When the dependent claim adds the very limitation they're trying to read into the independent claim, and in this case, it's even a stronger argument because that's the only limitation that's added. Why was not wireless data link expressly claimed in the patent? Because it was not an embodiment, it was not an alternative embodiment that was disclosed, Your Honor. It wasn't expressly disclaimed. It also wasn't expressly disclaimed. To answer your question, Your Honor, I think it's very clear that the patentee and the patent examiner understood data link to be broader than a wired connection. It could be a physical connection, not necessarily a cable or a wire. It could be a physical connection, say a circuit board. Again, Your Honor, That's broader than a cable, but yet it's a physical connection. That's true. It could have been any way, any way of getting data, getting these bed condition messages from the interface board to the remote processing station. We know that at least the patent owner and the patent examiner considered data link to be broader than just using a wired cable because of Claims 3 and Claims 10. I'm sorry, Your Honor. No, what I want to ask, Mr. Howes, what do we have in the record, if anything, as to the status of wireless connections in 1993? There is nothing in the record, Your Honor, that indicates that there were those kinds of data links, if we were, wireless data links out there at the time that the patent was applied for. Or is there any evidence that there were not? So, again, it's our argument, Your Honor, that you can't import this limitation from the specification, particularly where the patentee made clear and the patent examiner affirmed that data link has to necessarily be broader than a cable connection. Let's go back to the question that Judge Moore was asking you. Yes, Your Honor. I'm not too sure that you answered it. What's the objective evidence that you presented that a ProCEDA would find that data link encompasses a wireless technology? What's the objective evidence? The objective evidence is... And I'm talking about something that you could actually define as structure as opposed to function. There is only a single embodiment in the patent, Your Honor. And that embodiment, the embodiment of data link... I'm talking about the expert. What's the objective evidence that a ProCEDA, and this would include the expert testimony, but what's the objective evidence that a ProCEDA would understand data link 20 years ago to include wireless technology? Well, I'm not saying that there's objective evidence of that. And I don't think we need to say that, Your Honor, to get a reversal here. What we need to demonstrate is that the person of ordinary skill in the art, when reading the patent specification, and when reading claims 1 and 3 and 8 and 10, would not think, and in fact it would be, in our view, abundantly obvious to them... What you're saying, where's the evidence? What evidence have you presented that supports that argument you're making? That the claimed invention transmits bed condition messages from one location to another utilizing a data link, and we know that that data link must necessarily include other things than the preferred embody. Because it's claimed specifically in claims 3 and 10, not in claims 1 and 8. So our jurisprudence is that you're not limited to the single embodiment, the single embodiment of the patent. But you have to present some form of objective evidence that would lead us to agree with you that a ProCEDA would understand that wireless technology was contemplated. I think the question, Your Honor, is not whether we can demonstrate that the inventors were able to look into the future and determine what kind of data links might be created in the future, wireless, microwave, quantum ways of transmitting data from one place to another. I don't think that's the question, Your Honor. The question is whether a person of ordinary skill in the art looking at this would say, Your data link must be a cable and only a cable. I don't need to think about any other kinds of data. And the objective evidence in the claim differentiation argument in claim 3 and claim 10 is that the patentee specifically said, I am adding a limitation that only adds the requirement that the data link be cabled. Where is that in claim 3 and claim 10 in the 038 patent? Yes, Your Honor. I know it's in the 659. Your Honor, I may have misspoke. I may have misspoke, Your Honor. It's claim 3 and 10 of the 659 patent. That's my mistake, and I apologize. No, that's fine. I just wanted to make sure. It's claims 3 and 10 of the 659 patent that are in the record at A124. You've exhausted most of your rebuttal time. Would you like to save some? Yes, I would, Your Honor. Restore a little bit of it. Mr. Derringer. We're going to give Mr. Callahan a couple minutes of rebuttal time. If you run over, we'll be lenient. Don't worry. Thank you, Your Honor. Good morning, and may it please the court. This court has made perfectly clear that the specification is always highly relevant to the claim construction analysis. Usually, it's dispositive. It's the single best guide to the meaning of a disputed term. That's in the Phillips case. And this court has also made clear four years later that the claims cannot enlarge what is patented beyond what the inventor has described as the invention. It's with this guidance in mind that the term data link must be limited to a wired cable, as the district court concluded. And that's because, after looking at all of the arguments and the cases marshaled by either side on this issue, when you sit down and look at the specification. Why does it have to be limited to a wired cable and not, for example, a physical connection? Well, I think a physical connection is certainly much more supported by what the context of the specification reveals than anything that would be wireless. And it could encompass, I think, some kind of physical connection, because that is entirely consistent with the disclosure of the specification. What we're objecting to here is trying to broaden that term far beyond anything in the specification. And anything that any objective evidence discloses in this case, a person of ordinary skill in the art in 1993 would have understood a data link to be. I'm looking at page 471 and 472, which is the expert testimony of Dr. Singer, who has degrees from MIT in electrical engineering and computer science. And he says, a person of ordinary skill in the art, on page 472, would understand a data link to be established over wired, wireless, optical, or other connections. And he says that's the plain and ordinary meaning of the word data link at that time in this art. So why isn't that relevant? Well, number one, it's extrinsic evidence. Number two, it's extrinsic evidence of the most conclusory type. It's one sentence that he writes. He cites absolutely no other objective evidence, no dictionary definition, no publication, nothing at all to support that conclusory opinion that he offers. We don't think it's entitled to any weight. And in fact— Do you think if I were in 1993 or 95, I guess, when this patent—when did this patent issue? I don't know. Ninety-three. No, I guess 97. The 038 patent issued in 97. So in 1997, you think if I was discussing with somebody a data link in the abstract that, you know, we need a data link. We need to be able to get information from one place to the other, that a person of skill in the art would understand that as limited to a cable and never would ever think of the plain meaning of what I'm describing could be effectuated by optical or RF frequency or otherwise, which was, of course, well-known in 1997. Well, I think that, again, this court's jurisprudence teaches that you look at the plain and ordinary meaning in the context of the specification at issue. That's in the Phillips case and in the Thorner case. The words of a claim are generally given their plain and ordinary meaning as understood by the person of ordinary skill in the art. So I guess what I'm asking you is do you think a person of ordinary skill discussing the words data link would understand them to be limited to the cable? After reading that specification, yes, I do. But do you think divorced from the specification, it would a person of ordinary skill in the art, just plain meaning, you and I, we're not talking about bed messages. We're talking about a data link in 1997. Do you believe the plain and ordinary meaning would exclude, contrary to Dr. Singer's testimony, would exclude wireless transmission? I do think that. Where is your evidence of that? Well, Dr. Singer testifies that the plain and ordinary meaning of the word. Now, you may be right about the specification. I'm just trying to figure out, and I realize Phillips says I've got to do it with the specification, but I'm just trying to figure out how far you're going. Is the word data link, does it have a plain and ordinary meaning to people of skill in the art that would have included a wireless transmission? If I'm not focused on the specification, we're just having a conversation. Understood. If you look at page A347 of the joint appendix, this is paragraph 60. This is Hillrun's own application for a patent that was made in September of 2007. So, Judge Moore, 10 years after the timeframe that you're inquiring about. And in paragraph 60, this, by the way, is an application made by Hillrun for a very similar invention. Did you say A347? A347, I believe. Okay, that's a patent. Yes. You're looking at a… Yes, it's an application, I believe. All right. Paragraph 60. The paragraph 60. Okay. In that paragraph, Hillrun says data links are typically wired data links. However, it is within the scope of this disclosure for data links to be wireless. When Hillrun wanted to specifically claim a wireless data link, this is 2007, 10 years later. They knew how to do so. And in 2007, 10 years after 1997, they said data links are typically wired data links. Maybe not a cable, per se, but as Judge Reyna mentioned, some kind of physical wired connection. It's also, I think, important to remember, it's hard for me to remember this sometimes, 1997 was before the time of iPhones and iPads and the cloud and all of that. I don't think I had my first cell phone until after that. And so, it's important, again, to ground ourselves not just in 1997, but in 1993. And in that time period… Yes, but years before that, I had a little RF frequency car that operated with a handheld remote device. And I had already graduated in electrical engineering. RF frequency was really, really well known at that point in time. And so, what I'm struggling with is your notion… I mean, what you directed me to, obviously, allow for the understanding of data links to include wireless, because they expressly make sure you want it, they want you to know that they're covering it here. So, I hear you, but it's just, to me, the plain and ordinary meaning of data link, like Dr. Singer testified, is quite clearly broader than what you got the court to do here. Now, it may be that the specification causes us to narrow it, but the plain and ordinary meaning, it seems to me, has got to be broader. Well, I think that if you look at the decisions of this court in Nystrom and in Edwards, those are cases we described at great length in our brief, I think you need to ground the plain and ordinary meaning in the specification. And when you read that specification, I think it lines up very closely to both of those cases where, in Edwards, for example, graft, intraluminal graft, it was an interchangeable definition, as the court found there. I think the same thing could be said here. And in Edwards, the court concluded that an intraluminal graft was the only type of graft, the only device that was discussed, disclosed in the specification. The same thing, I think, applies here. So, when you look at that specification... Do you believe there is what I would call disclaimer here, where data link, to the extent it has a broader plain meaning, that broader plain meaning has been disclaimed clearly and unmistakably? I mean, do you think there is actually legal disclaimer? No, we don't go that far, and I don't think we need to go that far. Do you think there is actually lexicography? Have they expressly, to your belief, clearly and unmistakably defined data link as being a wired cable transmission? I think it comes much closer to that under the Edwards decision. Closer, or it is? Well, again, I think that following Edwards, it would be a definition. Tell me where exactly in the spec the definition is. The exact line. Sure. Let me get that for you. So, reference number 39 is called a data link by Hill-Rom. That's at A77. Which patent are you in? The 038. I'm in the 038 patent. Okay, so what column and line number? Column 12. Okay. Lines 61 through 64. You'll see that reference number 39 is called a data link. That's also the case at column 13, lines 7 through 15. Where is the definition, though? Well, it's the interchangeable use of the term data link with a cable or a serial cable throughout the patent. There is no express definition where it says data link herein is defined as a wired cable. It's expressly called out as illustrative. The accompanying drawing illustrated embodiments of the invention together with a general description of the invention serve to explain the principles, but it's clearly embodiment. Well, but I think actually that passage supports our position. You're at A73, column 4, line 59. The accompanying drawings illustrate embodiments of the invention and together with the general description of the invention given above and the detailed description of the embodiments given below serve to explain the principles of the invention and enable a person of ordinary skill in the art to practice the invention. I don't know what you're reading into that. What are you reading into that? Well, they're talking about the invention. Yeah, but they're not saying the present invention is a cable. I mean, you're reading way too much into our case law. If you want me to say whenever someone talks about the invention, it has created a limitation in the specification, especially when they're doing it in the context of embodiment. I'm certainly not going that far. I'm certainly not going that far. But again, the only data link that's described in the patent is a wired cable. And again, I think that when you look at the court's precedent, Phillips and Thorner and Nystrom and Edwards. What about on page A77, paragraph 40? It says, in one embodiment of invention, the bid input signals are received as hardwired inputs by the bid interface. So there, it's inferring that there's other embodiments. And potentially, those other embodiments are not hardwired inputs. But none of them are described whatsoever. There's nothing in here. And I don't think plaintiffs, I'm sorry, appellants have pointed to any evidence that a person of ordinary skill in the art would read this specification in 1993 and conclude that what's being claimed here is a wireless data link. Well, but Dr. Singer says that at the time, people understood data links to also be wireless data links. So why would you need to disclose that? That's not the, if it's already enabled and people of skill in the art already know it, why do you need to add that to the disclosure? Well, again, that's the sole evidence that Hillrong has presented. I believe it's not entitled to wait. As the district court concluded, it's extrinsic evidence and it's conclusory extrinsic evidence. I do want to ask you something. Sure. We have a, one of the things you cited to Phillips, and one of the things that Phillips did was give considerable prominence, I think, to the doctrine of claim differentiation. And that certainly seems to come into play here in connection with the 659 patent. Is it possible that whatever one may say about the 038 patent and the, what is the other one? The 592. You get to the 659, you have a very, with respect to claims three and 10, I guess, you have very clear claim differentiation. And isn't that a strong argument for the fact that by citing wired connections, it's making clear that the independent claim leading off is broader. So, as your honor knows, the doctrine of claim differentiation is only a guide that cannot be used to trump the clear import of the specification. We've cited- That's true, but no, you're right in that general language. But I don't have Phillips right in front of me, but reading Phillips, my recollection is that Phillips seemed to give a lot of force to the doctrine of claim differentiation. It seemed to be a theme running throughout a good part of the opinion. So, let's take a look at what's going on here in the 659 patent. The 659 examiner did allow, it's actually claim two that talks about a wired cable, a wired link. We believe that the issuance of claim two shows that the examiner believed that a wired data link was enabled by and described in the specification, which it is. But we don't think that means that the term data link is used in claim one of the 659 patent encompasses every conceivable way that one can now imagine of transmitting data. Would telepathy count, for example? We think that Hillrom specified a wired data link in claim two because it knew that that was the one and only data link that was described and enabled by the specification. There's no evidence, and none was presented to the examiner in the 659 application, that the examiner would have allowed the claim if what they had sought was protection of a wireless data link. Because the application for the 659 was filed in 07. Correct. That timing is very important, I think. It was filed in June of 07. And in June of 07, Hillrom asked for a claim specifying a wired data link. Three months later, in September of 2007, that's when Hillrom filed the application that matured as the 208 patent, the one that I mentioned a little bit before, I think, at page A347, 348. In that application, Hillrom said data links are typically wired data links. But here, this disclosure encompasses wireless. I think that timing is very important. In 2007, Hillrom filed a separate application where they specifically claimed a wireless data link with a different specification that supported that. And in that same year, they added claims to this family of patents that's at issue here, where they only specified a wired data link. So I think in the context of that history, I think it's appropriate, or not appropriate, for claim differentiation to trump the clear import of the specification. If I may, I was going to turn briefly to the judicial estoppel issue, if the panel is interested in that. I see my time is just about up. And let me just say this about estoppel here. If the panel determines, well, let me say that the estoppel issue is only really applicable to the construction of bed condition message. If the panel determines that the construction of data link or interface board is correct, you don't need to reach the issue of estoppel. But here's what the issue is. In order to gain allowance of a later application, Hillrom acknowledged that there were certain things that the Ulrich Invention at issue here could not do. How about if I cut you to the chase? How does what you're arguing comport with Pfizer? Because that's your problem. Your problem is our panel is bound by Pfizer, and your district court judge did the opposite of Pfizer here. So tell me why it's not the opposite of Pfizer. Pfizer relied on Goldenberg and Abbott. Goldenberg and Abbott both dealt with situations plainly different from what we're dealing with here. Those both dealt with situations where the later admission, the later representation, did not have to do with the invention in suit. They were dealing with something different. And we believe that's a critical distinction between the case that's presented here. If the result of Pfizer is that a patentee can say one thing about an invention to the PTO to get their claim allowed, and then say something entirely different about that invention to a trial court to prove infringement, then we think it's going to reward precisely the type of behavior that the doctrine of estoppel as announced by the Supreme Court in New Hampshire versus Maine was designed to prevent. The problem is the exception that you're asking us to create. Pfizer didn't leave it open with its broad language. I might agree with you that there are factual differences that on a clean slate we could certainly take a look at. But the problem for me is the language in Pfizer. Likewise, statements made during prosecution of a later unrelated patent cannot be used to interpret the claims of the 893 patent. I mean, they were sort of, boom, black letter, boom, you know, here's the rule. They didn't really allow for exceptions based on differing fact scenarios. Do you follow me? I do. I mean, the language of that opinion is just so precise and clear. I do. It's hard for me to imagine how I could write around it. The majority of that paragraph, and that's what it is, I think, a paragraph there. The majority, I think, applies to the argument about prosecution history estoppel. And there's one sentence at the end that says we also declined to adopt judicial estoppel. I think that that should be revisited. I think that this case presents a clear instance that the Supreme Court's jurisprudence in New Hampshire versus Maine is intended to address. Because if this kind of tactical behavior goes aloud, I think that for policy reasons I think it would have to be in vain. We don't need to readdress something that was already decided. That's the problem you have. Is there anything further? Did you want to touch on anything else? Unless the panel has any further questions on any of the other claim terms at issue or on data link as well, I'm happy to address them. Let's give Mr. Callahan a few minutes for rebuttal.  Thank you very much. Thanks, Your Honor. And thank you, Judge Moore, for getting the cite that I didn't have at the top of my head. It's A47172. That's the testimony from Dr. Singer. I think it's clear that if we do start off with data link having the meaning of moving data from one place to another, that the test of Phillips and Thorner in which we're looking for clear lexicographic language or unmistakable surrender of scope is not present. Edwards. Why didn't you pursue infringement under the doctrine of equivalence? Well, I think under the court's construction, I'm not sure that that ... I'm not sure you could say, given the briefing where we said, look, wireless is one form of data link, and the court said not in this case. It isn't. I'm not sure where that would leave us on that, Judge Raymond. But the fact of the matter is, Your Honor, is correct. That was not pursued below. So I think if we start with the plain and ordinary meaning of data moving something from one place to another, the lexicographic or unmistakable disavowal tests are not met. Edwards and Nystrom, I think both interesting cases. Edwards ... You want me to start from a plain and ordinary meaning of data moving one way to the other. This is the structure. This is not functional claiming. You didn't choose to use means plus function language or anything else here. No, we used data link. And data link is any of the ways that are known to move data from one location to the other. And you're saying the ways that were known are both wireless and wired, and that I should know that by relying on your expert. That's right, Your Honor. Edwards and Nystrom, I think, are the cases that Stryker leans heavily on. In Nystrom, I don't think that's applicable here. In Nystrom, the parties agreed on what the plain and ordinary meaning was, and it was the patentee that was seeking to expand that plain and ordinary meaning unsuccessfully. In Edwards, it was the invention itself. As I think Your Honor, Judge Moore, you pointed out, the invention here is not a novel kind of data link. It's a place where you can look at the results of that data, a collection of known things that are put together in a novel way. So, in our view, this case is significantly distinct from Edwards. And as on the Pfizer point, we think Pfizer is, as Your Honor pointed out, good law, and as we explained in our briefs, for good reason. Was the patent covering a satellite connection, that type of a data link? Absolutely, Your Honor. Absolutely, it could. So it would cover any and all types of... Data links. ...communications of data. Any kinds of data links. Yes, Your Honor. That's our position. No, it can't. It only covers the structures that were known at the time this application was filed. So if satellite links are developed in 2012, you didn't functionally claim. You claimed a structure, a data link structure. So you get whatever structures were known by people in the art at the time, right? Well, I think, Your Honor, if there is a new kind of data link that is created later on, this language is broad enough to cover it, in our view. Why? Why do you get a new kind created later on? It's not a functional claim. You claimed a structure. Well, it's... You used the word data link to cover everything that it was known to cover at the time. I would just go back to the black and white color television example, Your Honor. That example didn't help me, so stick with this case. Okay. If I claimed a way of getting data from one place to another, it's clear that they intended that to cover all known ways. Right. Okay. Wired, wireless, optical, right? If a new fangled way is later on... So basically, your word data link means wired, wireless, or optical. It only means the things that are known at the time. So if a new fangled way comes along, a totally different structure, you know, nanotechnology of some sort, it's not included. You may be able to get it under DOE, but not literally. How can you get it literally? Okay, Your Honor. I understand the court's position. But I'd like you to answer it. I think the way we would get that is to say it's not an entirely new structure. It's still a data link. We claimed a data link. It's still... Thank you, Your Honors, for your time this morning. We appreciate it. Thank you. Thank both counsel. The case is taken under submission.